UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  8/9/2022
```

-------------------------------------------------------------X

ANTHONY AYALA,                          :
                                        :
                    Plaintiff,          :
                                        :
        - against -                     :
                                        :
                                        :
KILOLO KIJAKAZI,                        :
COMMISSIONER OF SOCIAL SECURITY,[1]     :
                                        :
                    Defendant.          :

20-CV-09373 (RWL)


**DECISION AND ORDER:**
**SOCIAL SECURITY APPEAL**

-------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Anthony Ayala ("Ayala"), represented by counsel, commenced the instant action against Defendant Commissioner (the "Commissioner") of the Social Security Administration (the "Administration"), pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of the Commissioner's decision that Ayala is not entitled to disability insurance benefits ("DIB") and supplemental social security income ("SSI"). Ayala has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, asking the Court to vacate the administrative decision and reverse or remand the case for a new hearing and decision. The Commissioner has cross-moved for judgment on the pleadings and asks the Court to affirm the Commissioner's decision. For the reasons explained below, the Court GRANTS Ayala's motion, DENIES the Commissioner's motion, and REMANDS the case for further proceedings consistent with this decision.

---

[1] Kilolo Kijakazi became Acting Commissioner of Social Security on July 9, 2021, and was automatically substituted as Defendant in this action. *See* Fed. R. Civ. P. 25 (d).

## PROCEDURAL HISTORY

On May 3, 2018, Ayala filed a claim for Title II disability insurance benefits and a Title XVI application for supplemental social security income for a period of disability beginning on November 20, 2015, which was later amended to December 13, 2017 by the claimant's representative.  (R. 10.[2])  Ayala claimed disability due to back injury, neck injury, depression, pain in both shoulders, right elbow pain, numbness in both legs, and headaches.  (R. 38, 73, 84, 204.)

On July 13, 2018, the Administration denied Ayala's claim.  (R. 10.)  Ayala filed a written request for hearing on July 19, 2018.  (R. 10.)  On August 12, 2019, Ayala, represented by counsel, testified before Administrative Law Judge ("ALJ") Sharda Singh via video.  (R. 28-71.)  A vocational expert ("VE"), Christine DiTrinco, also appeared and testified.  (R. 29.)  On October 29, 2019, the ALJ issued a decision finding Ayala not disabled and capable of performing work that exists in significant numbers in the national economy.  (R. 19-20.)

After the ALJ's denial of his claim, Ayala requested review by the Appeals Council of the ALJ's decision.  (R. 179-81.)  On September 24, 2020, the Appeals Council denied Ayala's request for review, and the ALJ's decision became the final determination of the Commissioner.  (R. 1-6.)

Ayala filed his Complaint in this action on November 9, 2020, seeking district court review pursuant to 42 U.S.C. § 405(g).  (Dkt. 1.)  On October 26, 2021, the parties consented to my jurisdiction for all purposes.  (Dkt. 25.)  On December 29, 2021, Ayala moved for judgment on the pleadings.  (Dkt. 28.)  In response, on February 24, 2022, the

---

[2] "R." refers to the certified administrative record (Dkt. 15).

Commissioner cross-moved for judgment on the pleadings.  (Dkt. 30.)  On March 15, 2022, Ayala filed his Reply to the Commissioner's cross-motion.  (Dkt. 31.)

## APPLICABLE LAW

### A.    Standard Of Review

A United States District Court may affirm, modify, or reverse (with or without remand) a final decision of the Commissioner.   42 U.S.C. § 405(g); *Skrodzki v. Commissioner of Social Security Administration*, 693 F. App'x 29, 29 (2d Cir. 2017) (summary order).  The inquiry is "whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004); *see also Talavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012) (same).

"'Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations.'"  *Douglass v. Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (remanding for noncompliance with regulations)).  Courts review de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles.  *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (reversing where the court could not "ascertain whether [the ALJ] applied the correct legal principles … in assessing [plaintiff's] eligibility for disability benefits"); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (reversing where the Commissioner's decision "was not in conformity with the regulations promulgated under the Social Security Act"); *Thomas v. Astrue*, 674 F.Supp.2d 507, 515, 520 (S.D.N.Y. 2009) (reversing for legal error after de novo consideration).

If the reviewing court is satisfied that the ALJ applied the correct legal standards, then the court must "'conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision.'"  *Brault v. Social Security Administration, Commissioner*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).  Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971)); *see also Biestek v. Berryhill*, __ U.S. __, __, 139 S. Ct. 1148, 1154 (2019) (reaffirming same standard).   "The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would **have to conclude otherwise**."  *Brault*, 683 F.3d at 448 (internal quotation marks omitted) (emphasis in original); *see also* 42 U.S.C. § 405(g) ("findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record."  42 U.S.C. § 423(d)(5)(B).  The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based."  42 U.S.C. § 405(b)(1). While the ALJ's decision need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "'reconcile explicitly every conflicting shred of medical testimony,'" *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983), the ALJ may not ignore or

mischaracterize evidence of a person's alleged disability. *See Ericksson v. Commissioner of Social Security*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler*, 546 F.3d at 268-69 (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01-CV-1120, 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence).

Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982). The Court must afford the Commissioner's determination considerable deference and "'may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review.'" *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Secretary of Health and Human Services*, 733 F.2d 1037, 1041 (2d Cir. 1984)); *Dunston v. Colvin*, No. 14-CV-3859, 2015 WL 54169, at *4 (S.D.N.Y. Jan. 5, 2015) (same) (quoting *Jones v. Sullivan*, 949 F.2d at 59), *R. & R. adopted*, 2015 WL 1514837 (S.D.N.Y. April 2, 2015). Accordingly, if a court finds that there is substantial evidence supporting the Commissioner's decision, the court must uphold the decision, even if there is also substantial evidence for the claimant's position. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). "The Court, however, will not defer to the Commissioner's determination if it is the product of legal error." *Dunston*, 2015 WL 54169, at *4 (internal quotation marks omitted) (citing, *inter alia*, *Douglass*, 496 F. App'x at 156; *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)).

B.      **Legal Principles Applicable To Disability Determinations**

Under the Act, a person meeting certain requirements and considered to have a disability is entitled to disability benefits.  42 U.S.C. § 423(a)(1).  The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is disabled and therefore entitled to disability benefits, the Commissioner conducts a five-step inquiry.  20 C.F.R. § 404.1520.[3]  First, the Commissioner must determine whether the claimant is currently engaged in any substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i), (b).  If so, the claimant is not eligible for benefits and the inquiry ceases.

If the claimant is not engaged in any such activity, the Commissioner proceeds to the second step and must determine whether the claimant has a severe impairment, which is an impairment or combination of impairments that significantly limits the

---

[3] As noted at the outset, this case involves both DIB and SSI benefits.  For present purposes, the regulatory standards for DIB determinations and SSI provisions are essentially the same.  *Canter v. Saul*, No. 3:19-CV-00157, 2020 WL 887451, at *1 n.2 (D. Conn. Feb. 24, 2020) ("The regulations for disability and disability insurance and supplemental security income benefits are virtually identical.  The DIB regulations are found at 20 C.F.R. § 404.900, et seq., while the parallel SSI regulations are found at 20 C.F.R. § 416.901, et seq.")  For simplicity, in the absence of a material difference, the Court cites primarily to the DIB regulations.

claimant's ability to perform basic work activities.  20 C.F.R. §§ 404.1520(a)(4)(ii), (c). If the claimant does not have an impairment or combination of impairments that are severe, the claimant is not entitled to benefits and the inquiry ends.

If the claimant has a severe impairment or combination of impairments, the Commissioner continues to step three and must determine whether the impairment or combinations of impairments is, or medically equals, one of the impairments included in the "Listings" of the regulations contained at 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment or impairments meet or medically equal one of those listings, the Commissioner will presume the claimant to be disabled, and the claimant will be eligible for benefits.  20 C.F.R. §§ 404.1520(a)(4)(iii), (d).

If the claimant does not meet the criteria for being presumed disabled, the Commissioner continues to step four and must assess the claimant's residual functional capacity ("RFC"), which is the claimant's ability to perform physical and mental work activities on a sustained basis despite his impairments.  The Commissioner then determines whether the claimant possesses the RFC to perform the claimant's past work. 20 C.F.R. §§ 404.1520(a)(4)(iv), (f), (h).  If so, the claimant is not eligible for benefits and the inquiry stops.

If the claimant is not capable of performing prior work, the Commissioner must continue to step five and determine whether the claimant is capable of performing other available work.  20 C.F.R. §§ 404.1520(a)(4)(v), (g), (h).  If the claimant, as limited by his RFC, can perform other available work, the claimant is not entitled to benefits.  20 C.F.R. §§ 404.1520(a)(4)(iv), (v).  The claimant bears the burden of proof for the first four steps. *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).  Once the claimant has established

that he is unable to perform his past work, however, the Commissioner bears the burden of showing at the fifth step that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (internal quotation marks omitted).

## C.  Evaluation Of Medical Opinion Evidence

ALJs must consider medical opinion evidence of record.  *Rodriguez v. Colvin*, No. 12-CV-3931, 2014 WL 5038410, at *17 (S.D.N.Y. Sept. 29, 2014).   Until recently, regulations required application of the so-called "treating physician rule" pursuant to which the opinion of a claimant's treating physician presumptively was entitled to "controlling weight."  20 C.F.R. § 404.1527(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).   For claims filed prior to March 27, 2017, if the ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must determine how much weight, if any, to give that opinion.  *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). In doing so, the ALJ must "explicitly consider" the following, non-exclusive "*Burgess* factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."  *Selian*, 708 F.3d at 418 (citing *Burgess*, 537 F.3d at 129).  While failure to explicitly apply the *Burgess* factors is a procedural error, a reviewing court will not reverse the Commissioner's decision when the Commissioner has given "good reasons" for its weight assignment. *Estrella*, 925 F.3d at 96.  With respect to assigning weight to the opinions of non-treating physicians, an ALJ applying the earlier regulations must consider the same factors

evaluated when the ALJ does not give controlling weight to a treating physician.  20 C.F.R. § 404.1527(c).

For claims filed on or after March 27, 2017, the new regulations promulgated in 20 C.F.R. § 404.1520c apply.  Under the new regulations, a treating doctor's opinion is no longer entitled to a presumption of controlling weight.  Instead, all medical opinions are evaluated for their persuasiveness and must be assessed under the same standard of supportability and consistency with no presumption that one opinion carries more weight than another.  20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) … including those from your medical sources").

The new regulations give most importance to two of the same factors previously considered to determine whether a treating doctor's opinion should be given controlling weight, i.e., the extent to which a treating physician's opinion is supported by well-accepted medical evidence and not inconsistent with the rest of the record.  20 C.F.R. § 404.1520c(a) ("The most important factors we consider when we evaluate the persuasiveness of medical opinions … are supportability … and consistency").  In most instances, the ALJ may, but is not required to, discuss the other factors previously required to assess medical opinion evidence (i.e., relationship with the claimant, specialization, and other relevant factors).  20 C.F.R. § 404.1520c(b)(2).  The ALJ must consider those additional factors if there are "two or more medical opinions or prior administrative medical findings about the same issue [that] are both equally well-supported … and consistent with the record … but are not exactly the same," at which

point the ALJ must "articulate how [she] considered the other most persuasive factors …

." 20 C.F.R. § 404.1520c(b)(3).

An ALJ must not only consider supportability and consistency in evaluating medical source opinions but also must explain the analysis of those factors in the decision. 20 C.F.R. § 404.1520c(b)(2); *Vellone v. Saul*, No. 20-CV-261, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021), *R. & R. adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021) ("in cases where the new regulations apply, an ALJ *must* explain his/her approach with respect to the first two factors when considering a medical opinion") (emphasis in original). As noted in the Administration's revisions to the regulations, "the articulation requirements in [the] final rules" are intended to "allow a … reviewing court to trace the path of an adjudicator's reasoning." Revisions To Rules Regarding The Evaluation Of Medical Evidence, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017) (hereinafter "Revisions"); *see also Amber H. v. Saul*, No. 3:20-CV-490, 2021 WL 2076219, at *4 (N.D.N.Y. May 24, 2021) ("Although the new regulations eliminate the perceived hierarchy of medical sources … the ALJ must still 'articulate how [he or she] considered the medical opinions' and 'how persuasive [he or she] find[s] all of the medical opinions'") (alterations in original) (quoting 20 C.F.R. §§ 404.1520c(a), (b)).

Under the previous regulations, an ALJ's failure to consider the factors prescribed by the treating physician rule was grounds for remand. Similarly, under the current regulations, an ALJ's failure to properly consider and apply the requisite factors is grounds for remand. *See*, *e.g.*, *Rivera v. Commissioner of the Social Security Administration*, No. 19-CV-4630, 2020 WL 8167136, at *22 (S.D.N.Y. Dec. 30, 2020), (remanding so that ALJ may "reevaluate the persuasiveness assigned to the opinion evidence of record and

explicitly discuss both the supportability and the consistency of the consulting examiner's opinions") *R. & R. adopted*, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021); *Andrew G. v. Commissioner of Social Security*, No. 3:19-CV-942, 2020 WL 5848776, at *5-9 (N.D.N.Y. Oct. 1, 2020) (remanding due to ALJ's failure to adequately explain the supportability or consistency factors that led her to her decision).  As Ayala's application post-dates March 27, 2017, the Court applies the revised regulations applicable to evaluation of medical opinions.

**D.    Duty To Develop The Record**

"Social Security proceedings are inquisitorial rather than adversarial."  *Sims v. Apfel*, 530 U.S. 103, 110-11, 120 S. Ct. 2080, 2085(2000).   An ALJ must therefore "investigate the facts and develop the arguments both for and against granting benefits," *id*., 530 U.S. at 111, 120 S. Ct. at 2085, and has "regulatory obligations to develop a complete medical record before making a disability determination." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996); *see* 20 C.F.R. § 416.912(b)(1).  That obligation results from the non-adversarial nature of the instant proceedings and exists "even when ... the claimant is represented by counsel."  *Pratts*, 94 F.3d at 37; *see also Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record").

Prior to elimination of the treating physician rule, as part of their duty to develop the record, ALJs were required to obtain a relevant, comprehensive opinion from the claimant's treating physician, and courts frequently remanded cases where ALJs failed to do so.  *See*, *e.g.*, *Merriman v. Commissioner of Social Security*, No. 14-CV-3510, 2015

WL 5472934, at *18-19 (S.D.N.Y. Sept. 17, 2015) (finding that, despite considering and allocating "great weight" to the opinions of the plaintiff's consultative examiners, the ALJ "failed in his duty to develop the record fully and the absence of a medical opinion [from the treating physician] with regard to plaintiff's physical RFC requires remand here"); *Vera v. Barnhart*, No. 04-CV-7764, 2007 WL 756577, at *10 (S.D.N.Y. March 13, 2007) (remanding because the "ALJ had a clear duty to seek an opinion from [claimant's treating physician] regarding the existence, the nature, and the severity of the plaintiff's claimed disability"); *Serrano v. Barnhart*, No. 02-CV-6372, 2003 WL 22683342, at *16-17 (S.D.N.Y. Nov. 14, 2003) (remanding for further development of record based, *inter alia*, on absence of opinions from treating physicians).

An ALJ's failure to obtain a treating source opinion did not, however, necessarily require remand.  *See Swiantek v. Commissioner of Social Security*, 588 F. App'x 82, 84 (2d Cir. 2015) ("the absence of a medical source statement from claimant's treating physician [is not always] fatal to the ALJ's determination").  As the Second Circuit explained, an ALJ's failure to request medical source opinions was not per se a basis for remand where "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Commissioner of Social Security*, 521 Fed. App'x 29, 34 (2d Cir. 2013).  The need for a medical source statement from the treating physician hinged "on [the] circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record." *Sanchez v. Colvin*, No. 13-CV-6303, 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015) (citing *Tankisi*, 521 Fed. App'x at 33-34).

Although the treating physician rule has been abolished, the principle espoused by *Tankisi* still applies: whether remand is required because of failure to obtain an opinion from the claimant's treating physician depends on whether the ALJ could have reached an informed decision based on substantial evidence without it. *See Manzella v. Commissioner of Social Security*, No. 20-CV-3765, 2021 WL 5910648, at *14-16 (S.D.N.Y. Oct. 27, 2021) (recognizing continued force of *Tankisi* but remanding, among other reasons, because record was not sufficient without medical source statements from claimant's treating physicians), *R. & R. adopted,* 2021 WL 5493186 (S.D.N.Y. Nov. 22, 2021); *Prieto v. Commissioner of Social Security*, No. 20-CV-3941, 2021 WL 3475625, at *11 (S.D.N.Y. Aug. 6, 2021) (remanding where ALJ failed to make requisite follow-up attempt to obtain medical opinions from either of claimant's treating physicians); *Brian Z. v. Commissioner of Social Security*, No. 5:20-CV 737, 2021 WL 3552525, at *9-10 (N.D.N.Y. Aug. 11, 2021) (ALJ was not required to further develop record by contacting treating sources for medical source statement because medical records, plaintiff's testimony, and persuasive opinion evidence provided substantial evidence for RFC determination); *Angelica M. v. Saul*, No. 3:20-CV-727, 2021 WL 2947679, at *9 (D. Conn. July 14, 2021) (remanding and directing ALJ to seek updated medical source statement from treating therapist and treating physician).

## THE FACTUAL AND MEDICAL RECORD

### A.  Personal Background

Ayala was born on September 21, 1974 and has a twelfth-grade education.  (R. 53, 94, 205.)  He lives in a second-floor apartment in a co-op building with his girlfriend and daughter and uses an elevator to access his unit.  (R. 51-52, 378, 433.)

Ayala worked as a truck driver in 2011, making deliveries.  (R. 35-36.)  Starting in 2013, Ayala worked in maintenance, and his responsibilities included handling garbage and mopping.  (R. 36-37.)  Both jobs required him to regularly lift and carry over fifty pounds.  (R. 36-7.)

On December 13, 2017, due to a long-time leak, the ceiling in Ayala's bathroom fell on his head, and Ayala sustained serious injuries to his knees, shoulders, back, neck and right elbow.  (R. 33, 378, 599.)

**B.  Medical History**

Prior to the amended alleged onset date, on January 5, 2016, Ayala visited Dr. Dov Berkowitz for left shoulder pain resulting from a motor vehicle accident on November 20, 2015.  (R. 576.)  On September 14, 2016, Ayala underwent left shoulder surgery performed by Dr. Berkowitz.  (R. 16, 579-80.)  Despite the surgery, Ayala continued to report pain in his left shoulder when rotating it and during "stressful type[s] of activities."  (R. 582-3.)

After Ayala suffered injuries from the ceiling collapse in his home in December 2017, Dr. Berkowitz's treatment notes documented that Ayala complained of bilateral knee pain, "some clicking and buckling of his knees," pain while going up and down stairs, and pain with activities of daily living, and that the pain interfered with his ability to play sports, including baseball.  (R. 588, 590, 592.)  A cervical spine CT scan on December 13, 2017 revealed degenerative changes but no acute cervical spine fracture.  (R. 16, 294)

On January 15, 2018, Ayala started visiting orthopedist Dr. Louis Rose, complaining about aching, weakness, and decreased range of motion in his right shoulder

and upper arm.  (R. 378.)  X-rays of Ayala's right shoulder and right elbow, taken on the same day, revealed no fracture.  (R. 16, 380, 413.)  In his right shoulder, Ayala exhibited moderate to severe tenderness to direct palpitation.  (R. 379.)  An MRI of Ayala's right shoulder on January 26, 2018 revealed tendinosis/tendinopathy.[4]  (R. 16, 336, 388, 409-10.)  A right elbow MRI taken on February 10, 2018 further revealed triceps tendinitis and enthesopathy,[5] in addition to tendon tears.  (R. 16, 412.)

On March 10, 2018, Ayala underwent an MRI of his lumbar spine ordered by Dr. S. Ramachandran Nair.  (R. 16, 438-40.)  The MRI revealed disc herniations at L2-3 and L3-4,[6] disc bulging with thecal sac impression at L4-5,[7] and disc bulging at L5-S1.[8]  (R.

---

[4] "Tendinosis is defined as [d]egenerative lesions of a tendon without inflammation or symptoms .... It usually progresses to inflammation (tendinitis) and, eventually, a tendon rupture."  *Calzada v. Astrue*, 753 F. Supp.2d 250, 258 n.16 (S.D.N.Y. 2010) (internal quotation mark and citation omitted).

[5] "Enthesopathy is a 'disease process occurring at the site of insertion of muscle tendons and ligaments into bones or joint capsules.'"  *Iorio v. Commissioner of Social Security*, No. 18-CV-5898, 2020 WL 1536406, at *4 n.12 (E.D.N.Y. Mar. 30, 2020) (quoting *Enthesopathy*, *Stedman's Medical Dictionary*, 294790).

[6] A herniated disc is a "general term that means any extension of a disk beyond the margin of an adjacent vertebral body."  Tennenhouse, Dan J., *Attorneys' Medical Deskbook*, § 24:17 (4th ed. 2006-2011).

[7] "The thecal sac is a membrane that surrounds the spinal cord and spinal nerves.  It is filled with cerebral spinal fluid and acts as a protective barrier for sensitive nerve tissue."  *Addonisio v. Saul*, No. 17-CV-1013, 2020 WL 730555, at *6 n. 4 (E.D.N.Y. Feb. 13, 2020).

[8] "A normal human vertebral column consists of thirty-three vertebrae labeled according to their position and region (in descending order, cervical ('C1' through 'C7'), thoracic ('T1' through 'T12'), lumbar ('L1' through 'L5'), sacral ('S1' through 'S5') and coccygeal ('Co1' through 'Co4')).  The fifth lumbar vertebra, for example, is labeled 'L5.'  The space between the fifth lumbar and first sacral vertebrae, for example, is labeled 'L5–S1.'"  *Laureano v. Commissioner of Social Security*, No. 17-CV-01347, 2018 WL 4629125, at *2 n.3 (S.D.N.Y. Sept. 26, 2018) (quoting *Friedman v. Astrue*, No. 07-CV-03651, 2008 WL 3861211, at *2 n. 4 (S.D.N.Y. Aug. 19, 2008) (citing *Dorland's Illustrated Medical Dictionary*, 2079 (31st ed. 2007)).

16, 438.)  An MRI of his cervical spine performed on the same day similarly revealed disc herniations at C3-4, C4-5, and C5-6, with disc bulging and thecal sac impression at C6-7.  (R. 393, 398, 401, 404-5, 407-8, 552, 562, 567.)  On April 5, 2018, Ayala underwent arthroscopic surgery on his right shoulder.  (R. 33, 414-5.)

On November 25, 2018, an MRI of Ayala's left knee ordered by Dr. Berkowitz revealed a synovial effusion[9] in the knee joint with a small cyst, tear of the medial meniscus, medial collateral ligament sprain, and anterior cruciate ligament sprain.  (R. 16, 584-5, 590.)  An MRI of the right knee performed on the same day showed similar injuries, in addition to posterior ligament strain and anterior and anterolateral subcutaneous soft tissue swelling.  (R. 16, 586-7, 590.)

On February 16, 2019, a cervical spine MRI ordered by Dr. Angel Macagno demonstrated continuing disc herniations at C3-4 and C5-6 and disc bulging with thecal sac compression at C6-7.  (R. 599, 604, 623-4.)  A lumbar spine MRI conducted on the same day continued to show disc herniations at L2-3 and at L3-4, with increased "abutment of the right L3 nerves roots in the foramen."  (R. 599, 604,  625-6.)  After reviewing the MRI reports and noting decreased range of motion in Ayala's cervical and lumbar spine, Dr. Macagno concluded that Ayala was "temporar[ily] totally disabled" and noted that Ayala "has failed conversative treatment and wish[ed] to proceed with surgical intervention for cervical and lumbar spine."  (R. 600-2; *see also* R. 606-7.)

---

[9] "Synovitis is defined as 'inflammation of a synovial membrane. It is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion within a synovial sac.'"  *Longbardi v. Astrue*, No. 07-CV-5952, 2009 WL 50140, at *9 n.34 (S.D.N.Y. Jan. 7, 2009) (quoting *Dorland's Illustrated Medical Dictionary*, 1645 (28th ed.1994)).  Effusion is "the escape of a fluid from anatomical vessels by rupture or exudation." *Effusion*, https://www.merriam-webster.com/dictionary/effusion (last visited August 4, 2022).

On March 5, 2019, Dr. Berkowitz recommended Ayala for bilateral knee arthroscopies and prescribed him the pain medication Meloxicam to alleviate the pain in his knees.  (R. 592-93.)  In July 2019, Ayala underwent right knee surgery.  (R. 17.) Throughout the year of 2019, Ayala continued to receive treatment for his knee, shoulder, and back pain, including instructions on physical therapy and medication management from both Dr. Rose and Dr. Berkowitz.  (R. 17.)  The record does not indicate that Ayala proceeded with back surgery.

**C.    Ayala's Testimony About His Pain, Symptoms, And Abilities**

Ayala testified that following his surgery in April 2017, he continued experiencing pain in his right shoulder.  (R. 39.)  He also experienced pain in his neck and lower back and numbness in his hands, knees, and feet, especially when using the bathroom or sitting down.  (R. 38, 43.)  The numbness and tingling in his hands caused him to drop things every day.  (R. 40-41.)

Ayala testified that, due to his injuries, he could not sleep well, got only three hours of sleep per night, and had to take three two-hour naps during the day.  (R. 46-77.)  As part of the treatment of his pain, Ayala took narcotic pain medication and muscle relaxers, which had been causing side effects of dizziness and headaches.  (R. 42, 45-46.)  After his arthroscopic knee surgery in July 2019, Ayala walked with a cane prescribed by his doctors.  (R. 44.)

Ayala testified that due to difficulties with his right knee, he could only drive locally; during the school year, he drove his daughter to school, which was only a few blocks away from his apartment.   (R. 48.)   Ayala's girlfriend provided primary care for his

daughter and was in charge of household chores, including grocery shopping, cooking, and laundry.  (R. 46, 50-52.)

## D.     Opinion Evidence

The record includes medical source opinions from one of Ayala's treating physicians, two examining consultative doctors, and one non-examining consultative doctor who reviewed the medical record.

### 1.     Dr. S. Ramachandran Nair – Treating Physician For Early 2018

Dr. Nair treated Ayala from January 26, 2018 through April 17, 2018 on a monthly basis.  (R. 18, 348.)  On April 17, 2018, approximately four months after Ayala's injuries from the ceiling collapse, Dr. Nair completed a physical medical source statement.  (R. 348-54.)  Regarding Ayala's exertional capacity in a "competitive 8-hour work setting," Dr. Nair opined that Ayala could "occasionally" grasp, turn, and twist objects or use fingers/hands for fine manipulations and could "never" use arms for reaching (including overhead).[10]  (R. 352.)  Dr. Nair also opined that Ayala could never lift or carry even the smallest amount of weight ("0-5 pounds") and had significant limitations with reaching, handling, fingering or lifting.  (R. 351.)

Dr. Nair determined that Ayala could not sit or stand for more than 10 minutes at one time before needing to get up or sit down.  (R. 350.)  In addition, in an eight-hour working day, Ayala could sit and stand/walk for less than two hours and would need to take unscheduled breaks to rest at unpredictable intervals.  (R. 350-51.)  Dr. Nair

---

[10] The medical source statement filled out by Dr. Nair includes the following levels of activity for use of hands, fingers, and arms: "Never"; "Rarely," meaning "less than 1/3 of the time"; "Occasionally," meaning "1/3 of the time"; and "Frequently," meaning "1/3 to 2/3 of the time."  (R. 352.)

estimated that Ayala would likely be absent from work more than three times a month and would be incapable of even "low stress" work.  (R. 352-53.)  Dr. Nair further opined that Ayala is "currently totally disabled for work."  (R. 351.)

###    2.    Dr. Michael Healy – Internal Medicine Consultative Examiner

On June 29, 2018, Dr. Healy conducted a consultative internal medicine examination of Ayala.  (R. 432-35.)  Dr. Healy noted that Ayala's gait was slightly widened, his stride was slightly shortened, and his stance was slightly widened.  (R. 433.)  Although Ayala needed no help getting on and off the exam table, he could not rise from his chair without difficulty.  (R. 433.)

Dr. Healy further conducted a musculoskeletal examination, which revealed decreased flexion and extension in his cervical spine (20 degrees anterior and posterior) and lumbar spine (45 degrees) and decreased range of motion of both shoulders, with right shoulder having forward elevation and abduction of only 70 degrees.  (R. 434.)  Dr. Healy also found positive straight leg raising while sitting, as Ayala was unable to raise his legs above 30 degrees.  (R. 434.)  Otherwise, Dr. Healy noted full range of motion of elbows, forearms, wrists, hips, knees, and ankles bilaterally.  (R. 434.)

In terms of neurologic findings, Dr. Healy noted no sensory deficit and full strength in the upper extremities, rated at 5/5, but decreased strength in the lower extremities, rated at 4/5.  (R. 434.)  Dr. Healy concluded that Ayala's hand and finger dexterity was intact, and elbow flexion was normal in both arms; however, grip strength was reduced bilaterally, rated at 4/5.  (R. 434.)  There was no evident muscle atrophy.  (R. 434.)

Based on his findings, Dr. Healy concluded that Ayala had moderate limitations sitting, standing, walking, climbing stairs, bending, and lifting.  (R. 434.)

### 3. Dr. D. Chen – Agency Medical Record-Review Consultant

On July 10, 2018, Dr. Chen, a reviewing state agency medical consultant, completed a review of then-available records.  (R. 77-82, 89-93.)  In assessing Ayala's exertional limitations, Dr. Chen determined that Ayala could lift and carry ten pounds occasionally, and less than ten pounds frequently.  (R. 17, 79.)  Dr. Chen also opined that Ayala could, with normal breaks, stand or walk for a total of two hours and sit for about six hours in an eight-hour workday.  (R. 17, 79.)  Dr. Chen concluded that Ayala's ability to push or pull is "unlimited" other than as determined with respect to his exertional capacity for lifting and carrying.  (R. 17, 79.)

### 4. Dr. Jerry A. Lubliner – Examining Consultative Doctor

On May 8, 2019, Dr. Jerry A. Lubliner performed a consultative medical examination of Ayala.  (R. 448-54.)  Dr. Lubliner observed that although Ayala could not move his right shoulder more than 40 degrees in any direction during the examination, he had a negative Spurling sign,[11] with "no objective atrophy of his right upper arm to confirm his loss of range of motion … [and] no loss of muscle to confirm his subjective complaints." (R. 453.)  Dr. Lubliner further noted that Ayala suffered no anatomical loss of sensation of the upper extremities, while dismissing Ayala's complaints of loss of sensation in the lower extremities as "non-anatomic and non-dermatomal."  (R. 450, 453.)

In addition, Dr. Lubliner concluded Ayala had no objective evidence of radiculopathy or irritation of the femoral nerve, despite his complaints of bilateral pain on

---

[11] "[A] Spurling's maneuver is a test for cervical radiculopathy performed by placing downwards pressure on the patient's head.  The maneuver is positive if it causes pain." *Boryk ex rel. Boryk v. Barnhart*, No. 02-CV-2465, 2003 WL 22170596 at 2 n.4 (E.D.N.Y. Sept. 17, 2003).

the straight leg raising test bilaterally.[12]  (R. 453.)  Dr. Lubliner also found that Ayala's gait

was normal and that his legs had no atrophy.  (R. 453.)  Dr. Lubliner further opined that

Ayala's subjective complaints could not be verified, both due to lack of objective findings

in his examination and based on review of the medical records.  (R. 453.)

## E.    Course-Of-Treatment "Opinions": Dr. Berkowitz And Dr. Rose

The record does not include formal medical source opinions from the two treating

doctors who had the longest treating relationship, and thus the greatest familiarity, with

Ayala.  The treatment notes of both doctors, however, reveal certain opinions – rendered

during the normal course of treatment – regarding Ayala's functional abilities.

### 1.    Dr. Dov Berkowitz – Ayala's Treating Orthopedic Surgeon

Dr. Berkowitz treated Ayala from January 15, 2016 through July 17, 2019.  (R.

575.)  Physical examinations performed by Dr. Berkowitz on September 18, 2018 and

March 5, 2019 revealed decreased extension and flexion in Ayala's right knee (100/150

degrees in 2018; 115/150 degrees in 2019) and left knee (110/150 degrees in 2018;

120/150 degrees in 2019).  (R. 588, 592.)  Ayala was found to be neurologically intact in

both knees, with intact sensations.   (R. 588, 592.)  As of September 18, 2018, Dr.

Berkowitz diagnosed Ayala with "bilateral knee derangement" and described Ayala as

"partially disabled (75%)."  (R. 589.)  In a December 18, 2018 follow-up visit, Ayala was

evaluated by Dr. Berkowitz's colleague, Dr. Graeme Whyte, who assessed that Ayala

---

[12] "[R]adiculopathy is a disease of the nerve roots … often caused by compression of
nerve roots and often accompanied by … pain."  *Monroe v. Berryhill*, No. 17-CV-03373,
2018 WL 3912255, at *3 n.13 (S.D.N.Y. July 24, 2018), *R.& R. adopted*, 2018 WL
3910824 (S.D.N.Y. Aug. 15, 2018).

"has pain affecting both knees" which "is associated with significant functional limitation as well as mechanical symptoms."  (R. 590.)

### 2.    Dr. Louis Rose – Ayala's Treating Orthopedic Doctor

Dr. Rose, an orthopedic doctor, treated Ayala from January 2018 through April 2019 and produced at least 12 office notes, each recording an assessment of Ayala's physical conditions followed by plans for further treatment.  (R. 318-35, 378-416, 519-68, 572-74.)  The ALJ considered these treatment notes together as a medical opinion.  (R. 17.)  Throughout his fifteen-month treating relationship with Ayala, Dr. Rose consistently provided the following instructions in his treatment notes: "No overhead lifting, pushing or pulling.  No sudden rotation of head."  (R. 380, 384, 388, 393, 398, 401, 405, 408, 553, 557, 562-63, 567.)

In the first note on January 15, 2018, Dr. Rose noted that, in his right shoulder, Ayala exhibited reduced rotator cuff strength, rated at 4-/5.  (R. 379.)  His rotator cuff strength remained at 4-/5 from February through April 2019.  (R. 387, 392, 397.)  Ayala's right rotator cuff strength increased to 4/5 on May 7, 2018 and remained either at or above 4/5 through his last office visit on April 29, 2019, peaking with a rating of 4+/5 on July 30, 2018.  (R.  404, 407, 552, 556, 561, 566.)

In his right elbow, Ayala similarly exhibited decreased strength resistance, rated at 4/5 for flexion, supination, pronation, and extension.  (R. 379.)  Over the course of the treatment, Ayala's right elbow strength remained at 4/5, except for a slight increase to 4+/5 across all four categories on March 4, 2019.  (R. 388, 393, 561, 566.)  Dr. Rose further noted decreased grip strength in Ayala's right wrist and decreased strength in his right hand, despite good capillary refill to fingertips.  (R. 379-80, 397.)

On March 19, 2018, Dr. Rose observed decreased range of motion in all planes of the cervical spine region, with decreased strength resistance, rated at 4-/5, for cervical flexion, extension, right rotation, and left rotation.  (R. 392.)  Over time, Ayala's strength in cervical flexion, extension, and rotations remained at 4-/5, except for a brief increase to 4+/5 across all categories on September 10, 2018.  (R. 556, 561, 566.)

Regarding Ayala's lumbar/sacral spine, Dr. Rose noted decreased range of motion in all planes and reduced strength resistance, rated at 4-/5 for left lateral flexion, right lateral flexion, and hip flexion.  (R. 392.)  Ayala's lumber spine strength resistance to flexion remained at 4-/5 through March 4, 2019, except for an increase to 4+/5 across all categories on July 30, 2018.  (R. 552, 561.)  Dr. Rose further noted that Ayala walked with a shuffling type gait and experienced difficulty mounting and dismounting the examination table and rising from the seated position.  (R. 392.)  Dr. Rose also noted bilateral lumbar pain with bilateral straight leg raising to 70 degrees.[13]  (R. 392.)

## F.   Vocational Expert Testimony

At the hearing, the ALJ asked the VE to consider whether there were any jobs existing in significant number in the national economy that an individual of Ayala's age, educational level, prior work history, and RFC could perform.  (R. 65-67.)  The VE testified that such an individual could perform the jobs of final assembler, order clerk, and table

---

[13] The straight-leg-raising test is used to assess patients who complain of back pain that radiates down one leg for nerve root irritation.  Cupping the heel of the foot of that leg, the examiner will gently raise the leg.  If the patient experiences pain when his leg is elevated between 30 and 60 degrees, the test is positive, indicating that nerve root irritation is likely; if there is no sensitivity in that range, the test is negative and the patient is unlikely to be suffering from nerve root irritation.  *A Practical Guide to Clinical Medicine: Musculo-Skeletal Examination*, University of California, San Diego School of Medicine, available at https://meded.ucsd.edu/clinicalmed/joints6.html (last visited August 4, 2022).

worker.  (R. 66-7.)  Ayala's attorney then asked the VE whether Ayala could perform those

jobs if he could only occasionally use his hands for fine and gross manipulation.  (R. 69.)

The VE answered that Ayala would not be able to perform the jobs.  (R. 70.)  In response

to one of the ALJ's questions, the VE also stated that a hypothetical individual who would

need to take unscheduled breaks resulting in being off task for more than 15 percent of a

workday could not perform any job in the national economy.  (R. 67.)  Similarly, a

hypothetical individual who was absent two days per month would be unable to sustain

any employment.  (R. 67-8.)

## G.    The ALJ's Decision

ALJ Singh issued her decision on October 29, 2019, employing the requisite five-

step analysis.  (R. 10-20.)  She found that Ayala meets the insured status requirement of

the Social Security Act through December 31, 2019, and that he had not been engaged

in substantial gainful activity since the amended alleged onset date of December 13,

2018.  (R. 13.)  The ALJ concluded that Ayala had four severe impairments: cervical

radiculopathy, lumbar disc herniation, bilateral rotator cuff conditions, and bilateral knee

disorders.  (R. 13.)  She found, however, that none of those impairments, alone or in

combination, met or medically equaled the severity of one of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1.  (R. 14.)  Specifically, the ALJ concluded that

there was no evidence of inability to perform fine and gross movements effectively or of

an inability to ambulate effectively to satisfy the severity requirements of Listing 1.02;

similarly, there was also no evidence of arachnoiditis,[14] pseudoclaudication,[15] or nerve root compromise with motor loss and sensory loss or reflex loss to satisfy the requirements of Listing 1.04A.[16] (R. 14.)

Based on the entirety of the record, the ALJ determined Ayala had the RFC to perform sedentary work and frequent gross hand manipulations bilaterally, except that: he needs a sit/stand option after 20 to 30 minutes; can never climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; cannot perform overhead reaching with right upper extremity; must use a cane; and cannot work around hazardous heights or machinery.  (R. 15.)  The ALJ determined that Ayala's medically determinable impairments could reasonably be expected to cause symptoms; however, Ayala's statements concerning the intensity, persistence and limiting effects of those symptoms were "not entirely consistent" with the evidence in the record.  (R. 15.)

In reaching her decision, ALJ Singh assessed the medical records – including reports of MRI of Ayala's spine, right shoulder and elbow, and knees, and physical

---

[14] Arachnoiditis is the "inflammation of the arachnoid membrane often with involvement of the subjacent subarachnoid space." *Arachnoiditis*, *Stedman's Medical Dictionary* 58980.  The arachnoid membrane is "[o]ne of the three membranes (meninges) that surround the brain and spinal cord." *Arachnoid membrane,* oxfordreference.com (last visited August 4, 2022).

[15] "Pseudoclaudication causes leg pain, and 'can be a symptom of lumbar spinal stenosis, a condition that occurs when the spaces narrow between the vertebrae' of the lower back." *Pseudoclaudication: Is It Related to Claudication?*, https://middlesexhealth.org/le arning-center/qanda/pseudoclaudication-is-it-related-to-claudication (last visited August 4, 2022).

[16]  Listing 1.04A was replaced with Listing 1.15, effective April 2, 2021; however, the Administration continues to apply Listing 1.04A to applications filed before April 2, 2021. Revised Medical Criteria For Evaluating Musculoskeletal Disorders, 85 Fed. Reg. 78164, 78164 (Dec. 3, 2020).

examinations of motor strength and sensory capacity – as well as opinion evidence from four physicians.  (R. 15-18.)  Specifically, the ALJ found Dr. Chen's and Dr. Healy's opinions persuasive because they are supported, respectively, by "record review" and "examination;" moreover, the two opinions are "not inconsistent" with each other and "consistent with the claimant's noted decreased range of motion, no more than mild decreased strength, and limited sensory and gait abnormalities."  (R. 17.)

On the other hand, the ALJ found Dr. Rose's "opinion" unpersuasive because his instruction of no overhead lifting, pushing or pulling "is inconsistent with the mildly decreased motor strength noted on multiple examinations" and with the opinions of Dr. Chen and Dr. Healy.  (R. 17.)  Furthermore, noting that Dr. Nair had only treated Ayala for three months on a monthly basis, the ALJ also found Dr. Nair's opinion unpersuasive. (R. 18.)  Characterizing Dr. Nair's assessment of Ayala's limitations as "extreme," the ALJ concluded that the opinion is "supported by only minimal reference to objective clinical and diagnostic findings" and inconsistent with findings on physical examinations, all of the other medical opinions, and Ayala's own testimony as to his abilities.  (R. 18.)

Finally, ALJ Singh determined that Ayala was unable to perform any past relevant work but, considering his RFC, Ayala could perform the requirements of occupations such as final assembler, order clerk, and table worker; and, as a result, he is not disabled under the Act.  (R. 18-9.)

## DISCUSSION

Ayala contends that the ALJ's decision should be reversed or, alternatively, remanded for a new hearing, because her determination that Ayala is not disabled was

not supported by substantial evidence.  (Pl. Mem. at 13, 23.[17])  Ayala advances two arguments: first, the ALJ improperly found that Ayala's impairments did not meet or equal Listing 1.04A; second, the ALJ failed to properly assess the opinion evidence in evaluating Ayala's RFC.  In response, the Commissioner argues that substantial evidence supports the ALJ's decision because Ayala failed to demonstrate that his impairments meet all the specified medical criteria of Listing 1.04A, and the ALJ properly evaluated the medical opinions based on their supportability and consistency (or lack thereof).  (Def. Mem. at 15-25.[18])  The Court agrees with the Commissioner as to the first issue, and with Ayala as to the second.

## A.   The ALJ Properly Found That Ayala's Impairments Did Not Meet Or Equal Listing 1.04A

Ayala contends that the ALJ erred by concluding that his spinal condition did not meet or equal the requirements of Listing 1.04A.  Specifically, Ayala argues that evidence in the record suggests that he could meet the criteria of Listing 1.04A.  As a result, remand is proper where, as here, the ALJ's only reference to the criteria of Listing 1.04A is a mere recitation of the standard.  (Pl. Mem. at 16.)  The Court disagrees.  Substantial evidence in the record supports the ALJ's determination that Ayala's impairments do not meet or medically equal Listing 1.04A.

---

[17] "Pl. Mem." refers to Ayala's "Memorandum of Law In Support of Plaintiff's Motion For Judgment On The Pleadings And In Opposition To Defendant's Motion For Judgment On The Pleadings" (Dkt. 29).

[18] "Def. Mem." refers to Defendant's "Memorandum of Law In Opposition To Plaintiff's Motion For Judgment On The Pleadings And In Support Of The Commissioner's Cross-Motion For Judgment On The Pleadings"  (Dkt. 30).

### 1.    Sufficiency Of ALJ's Explanation

As a threshold matter, the Court disagrees with Ayala's suggestion that remand is warranted because the ALJ simply repeated particular elements of Listing 1.04A without providing any meaningful explanation for her conclusion.  (Pl. Mem. at 14-5.)  It is well-established that the ALJ need not "explicitly discuss every Listing in his written opinion, and there is no error in failing to discuss a particular Listing when substantial evidence indicates a claimant did not satisfy the Listing."  *Jones v. Berryhill*, 415 F. Supp. 3d 401, 419 (S.D.N.Y. 2019); *see also Perozzi v. Berryhill*, 287 F. Supp. 3d 471, 482 (S.D.N.Y. 2018) (rejecting plaintiff's contention that remand is required, notwithstanding the fact that the ALJ conducted "no analysis whatsoever" of the elements of Listing 1.04).

Thus, where, as here, the ALJ only cursorily mentions a particular Listing without providing more than boilerplate analysis, there is no error if the ALJ's determination is otherwise supported by substantial evidence in the record.  *See Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982) (affirming an ALJ's determination that the claimant did not meet Listing 1.04, and explaining that "in spite of the ALJ's failure to explain his rejection of the claimed listed impairments, [the court was] able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence").  Conversely, for cases in which the court "would be unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ," the court should remand the case for a clearer explanation for the decision. *Berry*, 675 F.2d at 469; *see also Ryan v. Astrue*, 5 F.Supp.3d 493, 507-8 (S.D.N.Y. 2014) (conflicting evidence in the

record regarding whether the plaintiff meets the requirements of Listing 1.04A warrants remand).

The case cited by Ayala in support of his argument, *Torres v. Colvin*, 2015 WL 4604000, at *3-4 (W.D.N.Y. July 30, 2015), is consistent with these standards but distinguishable on the facts.  Ayala cites *Torres* for the proposition that an ALJ's decision should be remanded where "the record evidence suggests that Plaintiff's symptoms could meet the Listing requirements in 1.04(A)" but the ALJ's "only reference to it is a recitation of the standard."  (Pl. Mem. at 16.)  However, as the *Perozzi* court correctly observed in distinguishing *Torres*, the *Torres* court decided that remand was necessary **only after** reviewing the record and still finding itself "unable to assess" the ALJ's rationale.  *Perozzi*, 287 F. Supp. 3d at 483 (citing *Berry*, 675 F.2d at 469).  In contrast, as discussed next, a review of the record reveals substantial evidence supporting the ALJ's finding that Ayala's impairments, alone or in combination, do not meet or equal Listing 1.04A.

### 2.    Substantial Evidence That Ayala Does Not Satisfy Listing 1.04A

Each Listing sets out "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3).  To meet their burden, claimants must "meet all of the specified medical criteria [in the listing].  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 891 (1990) (emphasis omitted); *see also* 20 C.F.R. §§ 404.1525(c)(3), 404.1529(d)(2)-(3) (the Administration's guidelines for deciding whether a Listing is met or medically equaled); *see also Solis v. Berryhill*, 692 F. App'x 46, 48 (2d Cir. 2017) (summary order discussing Listing 11.14); *Knight v. Astrue*, 32 F.Supp.3d 210, 218 (N.D.N.Y. 2012) (a claimant "must offer medical findings equal in

severity to all requirements, which findings must be supported by medically acceptable clinical and laboratory diagnostic techniques") (citing 20 C.F.R. § 416.926(b)).

To meet the Listing at issue here, 1.04A, a claimant must demonstrate "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root … or the spinal cord," with

> [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) ….

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.04, 1.04A.  The Court considers in turn each contested element of Listing 1.04A, namely "nerve root compression," "motor loss," "sensory loss," and "reflex loss."  While the record presents some evidence of nerve root compression, there is substantial evidence supporting the absence of motor loss accompanied by sensory or reflex loss.

### a.   Nerve Root Compression

Evidence in the record appears to support the existence of nerve root compression. The two MRIs of Ayala's cervical spine performed on March 10, 2018 and February 16, 2019 consistently revealed disc herniations at C5-6 "impress[ing] on the … ventral margin of the cord," at C3-4 "with peripheral disc encroachment into the foramen bilaterally," and at C4-5 "impressing on the ventral thecal sac and … nearly abutting the ventral margin of the cord," in addition to "disc bulging and thecal sac impression" at C6-7.  (R. 393, 398, 401, 404-5, 407-8, 552, 562, 567 599, 604, 609, 614, 623-24.)

Similarly, the two MRIs of Ayala's lumbar spine performed on March 10, 2018 and February 16, 2019 both demonstrated continuing disc herniations at L2-3 "extending into the foramen bilaterally … and impressing on the thecal sac" and at L3-4 with "impression on the left and near abutment of the right L3 nerve roots in the foramen;" disc bulging with thecal sac impression "encroaching into the foramen with … central spinal stenosis" at L4-5;[19] and 1mm retrolisthesis and disc bulging at L5-S1.[20]  (R. 438-39, 599, 604, 609, 614, 625-26.)

The ALJ's own summary of medical findings – when determining Ayala's RFC – cited to and reaffirmed the above-mentioned MRI results.  (R. 16.)  The ALJ's conclusion that Ayala did not meet Listing 1.04A would not be supported by substantial evidence if, in addition to nerve root compression, the record sufficiently established the other required elements.  The record, however, does not do so, instead supporting the ALJ's conclusion.

### b.  Motor Loss And Sensory Or Reflex Loss

Notwithstanding the evidence of nerve root compromise, Listing 1.04A also requires "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss[.]"  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.04,

---

[19] "Spinal stenosis is a narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space; symptoms are caused by compression of the cauda equina and include pain, paresthesias, and neurogenic claudication.  The condition may be either congenital or due to spinal degeneration."  *Higgins v. Berryhill*, No. 17-CV-5747, 2018 WL 6191042, at *2 n.5 (S.D.N.Y. Nov. 28, 2018) (internal quotation marks omitted).

[20] "Retrolisthesis is a posterior displacement of a vertebral body that can cause localized back pain, pain on hyperextension, and sciatic pain due to irritation of the first sacral nerve root."  *Kessler v. Colvin*, 48 F.Supp.3d 578, 586 n. 5 (S.D.N.Y. Sept. 17, 2014) (citing *Dorland's Illustrated Medical Dictionary*, 619 (27th ed.1988)).

1.04A.  Despite evidence of some mild loss of motor strength, the loss is not sufficient to satisfy the Listing requirements; and, even if it was sufficient, there is substantial evidence to support a finding that Ayala did not suffer from the requisite sensory or reflex loss.

Ayala exhibited mildly reduced motor strength across multiple muscle groups.  As documented in the treatment notes by Dr. Rose, Ayala's right shoulder had reduced rotator cuff strength, consistently rated either at or above 4-/5 from January 2018 through April 29.[21]  (R. 379, 387, 392, 397, 404, 407, 552, 556, 561, 566.)  Meanwhile, Ayala's right elbow strength also remained at 4/5 through April 29, 2019.  (R. 388, 393, 561, 566.)  Throughout the treating relationship, Ayala showed reduced strength resistance in the cervical spine region, rated between 4-/5 and 4+/5 for flexion, extension, and rotations.  (R. 392, 556, 561, 566.)   Similarly, Dr. Rose noted diminished strength resistance regarding Ayala's lumbar/sacral spine, rated between 4-/5 and 4+/5 for left lateral flexion, right lateral flexion, and hip flexion through March 4, 2019.  (R. 392, 552, 561.)  Dr. Healy also found some reduced strength measures, including decreased strength in the lower extremities, rated at 4/5, and grip strength reduced bilaterally, rated at 4/5, but without muscle atrophy.  (R. 434.)  Like Dr. Healy, Dr. Lubliner also found no objective evidence of atrophy.  (R. 450, 453.)

In short, Dr. Rose and Dr. Healy rated Ayala's strength as ranging from 4-/5 to 5/5 in all relevant muscle groups, and Dr. Lubliner and Dr. Healy discerned no signs of muscle atrophy.  Those findings are too minor to meet the requirements of Listing 1.04A.  As one

---

[21] Strength findings of 4-, 4, and 4+ are characterized as "good."  *See* National Institute of Environmental Health Sciences, Manual Muscle Testing Procedures, Key to Muscle Grading, https://www.niehs.nih.gov/research/resources/assets/docs/mmt8_grading_and _testing_procedures_for_the_abbreviated_8_muscle_groups_508.pdf (last visited Aug. 4, 2022).

court has observed, "[o]ccasional reports of slightly diminished motor strength ... are insufficient to satisfy Listing 1.04 (A)'s requirement of 'motor loss (atrophy with associated muscle weakness or muscle weakness).'" *Lisandra A. v. Commissioner of Social Security*, No. 20-CV-4796, 2022 WL 522444, at *5 (S.D.N.Y. Feb. 22, 2022); *accord Killings v. Commissioner of Social Security*, 15-CV-8092, 2016 WL 4989943, at *11 (S.D.N.Y. Sept. 15, 2016) ("At its worst, the plaintiff's motor strength was reported as 'slightly diminished' or rated at '4/5.'  Therefore, the ALJ's finding that the plaintiff's spinal impairment did not meet Listing 1.04 is supported by substantial evidence") (internal citations omitted); *Gray v. Kijakazi*, No. 20-CV-4636, 2022 WL 974385, at *10 (S.D.N.Y. March 31, 2022) (concluding that the plaintiff's spinal impairments did not meet Listing 1.04A after finding "nearly full muscle strength" in the record evidence, including "Muscle grade strength 4/5 cervical/lumbosacral paraspinals; 4/5 right deltoid, supraspinatus, infraspinatus; 4-/5 right teres minor, subscapularis") (internal quotation marks omitted); *Aguirre v. Saul*, No. 20-CV-4648, 2021 WL 4927672, at *6 (S.D.N.Y. Oct. 22, 2021) (finding Listing 1.04A "not satisfied" where the plaintiff's "muscle grade strength was assessed as 4/5 lumbosacral paraspinals") (internal quotation marks omitted).

Evidence in the record also suggests that Ayala exhibited no significant loss of sensation: Dr. Lubliner noted that, despite Ayala's subjective complaints of loss of sensation, he suffered no anatomic loss of sensation of the upper or lower extremities. (R. 450, 453.)  Dr. Healy also noted no sensory deficit and full strength in Ayala's upper extremities, (R. 434), and Dr. Berkowitz found Ayala to be neurologically intact in both knees, with intact sensations.  (R. 588, 592.)

Substantial evidence in the record thus supports a finding that Ayala does not have the motor loss accompanied by sensory or reflex loss required by Listing 1.04A. Accordingly, the ALJ's conclusion that Ayala's impairments did not meet or equal Listing 1.04A, despite its brevity, is supported by substantial evidence.

**B.    The ALJ Did Not Properly Evaluate Medical Opinion Evidence**

Ayala next contends that the ALJ erred in finding unpersuasive the medical opinions offered by his treating physicians, Dr. Rose and Dr. Nair, while finding persuasive the opinions offered by one-time examining consultant Dr. Healy and non-examining record consultant Dr. Chen.   Ayala argues that the ALJ failed to properly explain the supportability and consistency factors required under the operative regulations.  (Pl. Mem. at 19.)  The Court agrees with Ayala.

The ALJ "***must***," on a source-level, "explain his [ ] approach with respect to the [supportability and consistency factors] when considering a medical opinion."  *Vellone*, 2021 WL 319354, at *6 (emphasis in original); *see also* 20 C.F.R. § 404.1520c(b)(2) ("We will explain how we considered the supportability and consistency factors for a medical source's medical opinions ... in your determination or decision"); *see also Prieto v.*, 2021 WL 3475625, at *13 ("Eschewing rote analysis and conclusory explanations, the ALJ must discuss the crucial factors in any determination ... with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence") (quoting *Vellone*, 2021 WL 319354, at *4).  Consequently, an ALJ's failure to properly consider and explain the supportability and consistency factors constitute grounds for remand.  *See Prieto*, 2021 WL 3475625, at *9 (noting that under both the treating physician rule and the new regulations, "an ALJ's failure to properly consider and

apply the requisite factors is grounds for remand"); *see also* Revisions, 82 Fed. Reg. at 5858.

To analyze supportability, the ALJ must conduct "an inquiry confined to the medical source's own records that focuses on how well a medical source supported and explained their opinion." *Vellone*, 2021 WL 319354, at *6.  The more relevant the evidence and explanations are, the more persuasive the medical opinion is.  20 C.F.R. § 404.1520c(c)(1).  On the other hand, to analyze consistency, the ALJ must conduct "an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Vellone*, 2021 WL 319354, at *6.  The more consistent the medical opinion being analyzed is with the other sources, the more persuasive the medical opinion is.  20 C.F.R. § 404.1520c(c)(2).

With this understanding, the Court now evaluates whether the ALJ properly analyzed the supportability and consistency of each of the four opinions in dispute.[22]  The Court concludes that, among other errors, the ALJ failed to properly apply the supportability and/or consistency factors for all four opinions, improperly drew her own expert medical conclusions, and mischaracterized the record.  Additionally, the ALJ failed to sufficiently develop the record.  As a result, remand is warranted.

---

[22] In her decision, the ALJ inexplicably never evaluated the opinion evidence offered by Dr. Lubliner, who performed a one-time consultative medical examination of Ayala in May 2019.  (R. 448-54.)  Additionally, despite briefly referring to results from the MRI scans ordered by Dr. Berkowitz (R. 16), who started to treat Ayala for his knee-related impairments as early as January 2016 and continued into 2019 (R. 575-95), the ALJ did not solicit or evaluate any opinion evidence from Dr. Berkowitz.  Ayala has not challenged the ALJ's consideration – or lack of consideration – of the opinions or statements of either Dr. Lubliner or Dr. Berkowitz.  (*See* Pl. Mem. At 17-23.)  The opinions at issue thus are those of Dr. Nair, Dr. Rose, Dr. Chen, and Dr. Healy.  On remand, however, the ALJ should assess Dr. Lubliner's medical source opinion – or explain why she has not done so – and account for Dr. Berkowitz's treatment of Ayala.

### 1.    The ALJ's Evaluation Of Dr. Chen's and Dr. Healy's Opinions

After highlighting the conclusions made by Dr. Chen and Dr. Healy about Ayala's

exertional limitations, the ALJ concluded:

> I find the opinions of Dr. Chen and Dr. Healy to be persuasive.  Dr. Chen's
> opinion is supported by record review, and Dr. Healy's opinion is supported
> by examination.  While Dr. Healy's opinion is not as specific as Dr. Chen's
> the broad moderate limitations he described are not inconsistent with the
> more specific limitations assessed by Dr. Chen, consistent with a range of
> work-related  activities at the sedentary exertional level.  The opinions of Dr.
> Chen and Dr. Healy are consistent with the claimant's noted decreased
> range of motion, no more  than  mild  decreased  strength,  and  limited
> sensory and gait abnormalities, as previously described.

(R. 17.)  The ALJ's assessment of the supportability of Dr. Chen and Dr. Healy's opinions

is highly conclusory.  The ALJ offered only that "Dr. Chen's opinion is supported by record

review" and that "Dr. Healy's opinion is supported by examination."

Such  conclusory  statements  offer  no  insight  into  "how  well  [either  doctor]

supported  and  explained  their  opinion,"   *Vellone*,  2021 WL 319354,  at *6,  and  are

insufficient to withstand review.  *See Prieto*, 2021 WL 3475625, at *13 (concluding that

the ALJ "failed to satisfy his obligations under the [new] regulations" when, in applying the

supportability and consistency factors, the only reasoning the ALJ provided was that the

doctor's opinion was "supported by the medical evidence of the record and by her

underlying examination") (internal quotation marks omitted) ; *Brianne S. v. Commissioner

of Social Security*, No. 19-CV-1718, 2021 WL 856909, at *5 (W.D.N.Y. March 8, 2021)

(the ALJ committed legal error by failing to adequately apply the supportability factor

because the ALJ "did not examine what [the doctors] used to support their opinions and

reach their ultimate conclusions") (internal quotation marks omitted); *see also Acosta

Cuevas v. Commissioner of Social Security*, No. 20-CV-502, 2021 WL 363682, at *14

(S.D.N.Y. Jan. 29, 2021) (finding that it is insufficient for the ALJ to simply cite to "some objective medical evidence in the record" and conclude that an opinion is "consistent with other evidence in the file" and therefore "persuasive"), *R. & R. adopted*, 2022 WL 717612 (S.D.N.Y. March 10, 2022); *Raymond M. v. Commissioner Of Social Security*, No. 5:19-CV-1313, 2021 WL 706645, at *10 (N.D.N.Y. February 22, 2021) (remanding because the ALJ "merely states" that an examining physician's opinion is "not consistent with[ ] the overall medical evidence," without adequately explaining his reasoning as to the consistency factor).

With respect to consistency, the ALJ offered more explanation by finding the opinions of Dr. Chen and Dr. Healy consistent with each other and with results of Ayala's physical and medical examinations "previously described" at other steps of her five-step evaluation, specifically "decreased range of motion, no more than mild decreased strength, and limited sensory and gait abnormalities."  (R. 17.)  Such explanation may barely meet the requirements of a sufficient explanation, which requires that the ALJ "identify specific objective findings" so the Court can evaluate the evidence on which the ALJ relied.  *Jackson v. Kijakazi*, No. 20-CV-07476, 2022 WL 620046, at *19 (S.D.N.Y. March 3, 2022) (remanding because, although the ALJ provided a summary of the doctor's findings and concluded that the opinion was "consistent with the findings of other exams throughout the longitudinal records," the ALJ "did not identify the specific objective findings to which he referred") (internal citation and quotation marks omitted); *see also Balotti v. Commissioner of Social Security*, No. 20-CV-8944, 2022 WL 1963657, at *5 (S.D.N.Y. June. 6, 2022) (remanding where, in finding a doctor's opinion less persuasive, "the ALJ referred only to other 'clinical findings and objective findings in the record,'

entirely omitting any discussion of [the doctor's] explanations and what he considered in arriving at his opinion").  Still, greater specificity and citation to specific evidence of record would be better practice to assist the Court with determining whether the ALJ's decision is supported by substantial evidence and not otherwise in error.

In any event, on remand, the ALJ will have to reconsider the consistency factor for the opinions of Dr. Chen and Dr. Healy in light of any newly obtained medical opinions of Ayala's treating physicians pursuant to the Court's directives below.

### 2.    The ALJ's Evaluation Of Dr. Nair's Opinion

The ALJ also erred in her evaluation of the opinions offered by Ayala's treating physician Dr. Nair.  Specifically, the ALJ improperly drew her own medical conclusions, failed to sufficiently explain the consistency factor, and discounted Dr. Nair's opinion based on the limited length and frequency of his seeing Ayala while not doing so for the consulting doctors.

### a.    Supportability

The ALJ's sole reference to the supportability of Dr. Nair's opinion is that "Dr. Nair's opinion is supported by only minimal reference to objective clinical and diagnostic findings."  (R. 18.)  Dr. Nair provided his opinion using a "check-box" form with little elaboration and did not provide supporting records.  (R. 348-54.)  The ALJ could properly discount the opinion on that basis, given the dearth of other records from Dr. Nair.  *See Colgan v. Kijakazi*, 22 F.4th 353, 361 (2d Cir. 2022) ("[A] treating physician's medical opinion is not entitled to controlling weight where it is provided in a check-box form and is unaccompanied by meaningful medical evidence in the administrative record") (alteration added); *Heaman v. Berryhill*, 765 F. App'x 498, 501 (2d Cir. 2019) (affirming

ALJ's decision to discount treating physicians' opinions provided via "checkbox forms" that "offer[ed] little or nothing with regard to clinical findings and diagnostic results" and "were inconsistent with ... findings reflected in the doctors' notes") (internal citation and quotation marks omitted); *Halloran v. Barnhart*, 362 F.3d 28, 31 n.2 (2d Cir. 2004) (describing "standardized form" as "only marginally useful for purposes of creating a meaningful and reviewable factual record"); *but see Brown v. Commissioner of Social Security*, No. 19-CV-4935, 2020 WL 3914851, at *6 (S.D.N.Y. June 23, 2020) ("The ALJ erred when he rejected Dr. Qayyum's opinion because it was in a check off format with no reference to underlying clinical observations because the Social Security Administration regulations do not prescribe any particular format in which the treating medical source's opinion must be produced.  Thus, the check off format with no reference to underlying clinical observations, was not a good reason not to give controlling weight to Dr. Qayyum's opinion") (internal quotation marks omitted) (citing 20 C.F.R. § 416.927(c)(2)).  As explained next, however, the ALJ erred in other respects in evaluating Dr. Nair's opinion.

### b.   Consistency

The ALJ found the "extreme limitations" assessed by Dr. Nair inconsistent with "findings on physical examinations, including only relatively mildly reduced strength," "all of the other medical opinions of record," and "the abilities the claimant testified to at the hearing."  (R. 18.)  None of those explanations are supported by substantial evidence.

First, the ALJ's assessment that the limitations found by Dr. Nair were inconsistent with physical findings, particularly "relatively mildly reduced strength," was entirely conclusory.  Among other limitations the ALJ deemed "extreme," were Dr. Nair's opinion

that, in "a competitive work situation," Ayala could never lift or carry even the smallest amount of weight ("0-5 pounds") and, during "a competitive 8-hour work setting," could "occasionally" grasp and use fingers or hands for fine manipulations, and could "never" use arms for reaching (including overhead).  (*See* R. 351-52.)

The ALJ provided no explanation for why those assessments of Ayala's exertional capacities, made by Dr. Nair specifically in relation to a competitive work environment, are necessarily inconsistent with "relatively mildly reduced strength."  (R. 18.)  Can an individual who has mildly reduced strength but, like Ayala, suffers from decreased range of motion in his spine, lift or carry small amounts of weight as needed during an eight-hour work day?  The Court is not in a position to make that determination, and neither was the ALJ.  The ALJ erred by drawing that medical conclusion herself and improperly assuming "the mantle of a medical expert."  *See Amarante v. Commissioner of Social Security*, No. 16-CV-0717, 2017 WL 4326014 at *10 (S.D.N.Y. Sept. 8, 2017) (remanding because the ALJ "improperly assume[d] the mantle of a medical expert"); *see also Vellone*, 2021 WL 319354, at *9 (remanding because the ALJ "was not in a position to determine whether Plaintiff's ability to heel, toe, and tandem walk during a medical examination should invalidate the physical limitations set forth in Dr. Azeez's Medical Findings Summary"); *see also Riccobono v. Saul*, 796 F. App'x 49, 50 (2d Cir. 2020) ("the ALJ cannot arbitrarily substitute h[er] own judgment for competent medical opinion") (alteration in original); *Bienvenido J.P. v. Commissioner of Social Security*, No. 20-CV-9270, 2022 WL 901612, at *5 n. 3 (S.D.N.Y. March 28, 2022) ("The ALJ remains a layperson and should not 'assume the mantle of a medical expert,' whether he does so

in the context of the treating physician's rule or when addressing the supportability and consistency of a medical opinion").

Second, the ALJ erred in finding that Dr. Nair's opinion that Ayala could never lift or carry the smallest amount of weight or use his arms for overhead reaching was inconsistent with "all of the other medical opinions in the record." (R. 18.) To be sure, Dr. Nair's assessment does appear inconsistent with the conclusions drawn by Dr. Healy (Ayala had "moderate limitations sitting … and lifting") and by Dr. Chen (Ayala could lift and carry ten pounds occasionally). (R. 18, 79, 351, 434.) On the other hand, Dr. Nair's assessment does not appear inconsistent with Dr. Rose's instruction that Ayala be limited to "no overhead lifting, pushing or pulling" in his office notes, which the ALJ characterized as a medical opinion. (R. 17.) The ALJ thus was incorrect in finding that Dr. Nair's assessment was inconsistent with all other opinions. Although, as discussed below, the ALJ also erred by deeming as an "opinion" Dr. Rose's numerous treatment instructions consistently prescribing no overhead lifting, pushing or pulling, the ALJ could not simultaneously deem Dr. Rose to have provided an opinion and then ignore that opinion as one of "all" the opinions of record in evaluating Dr. Nair's opinion.

Third, the ALJ provided no explanation as to why Dr. Nair's opinion necessarily is inconsistent with Ayala's hearing testimony about his exertional capacities. The ALJ did not identify any specific testimony or claimed ability that was inconsistent with Dr. Nair's opinion. Instead, the ALJ only generally stated that the limitations found by Dr. Nair "are inconsistent with the abilities the claimant testified to at the hearing" (R. 18), thus leaving the Court without the ability "to trace the path of [the ALJ]'s reasoning." Revisions, 82 Fed. Reg. at 5858.

### c.      Length And Frequency Of Treating Relationship

Finally, the ALJ erred in finding Dr. Nair's opinion unpersuasive in part due to Dr. Nair having treated Ayala only three times in three months.  (*See* R. 18.)  To be sure, an ALJ may properly consider the length and frequency of a treating relationship in assessing the persuasiveness of a medical opinion.  20 C.F.R. §§ 404.1520c(c)(3)(i)-(ii).  But the ALJ clearly did not apply that factor consistently.

The ALJ found Dr. Rose's opinion unpersuasive, even though of all the doctors who provided opinions, Dr. Rose saw Ayala the most times and for the longest overall period of time – at least 12 times over a period of 15 months.  At the same time, nothing in the ALJ's decision indicates that she discounted either Dr. Healy or Dr. Chen's opinions based on length and frequency, even though agency consultant Dr. Healy examined Ayala only once, and agency consultant Dr. Chen did not examine Ayala at all.

An ALJ may find a consulting doctor's opinion persuasive while finding a treating doctor's opinion unpersuasive.  *See, e.g., Amber H.*, 2021 WL 2076219, at *5 (concluding that "an ALJ may rely on the opinion of a non-examining state agency consultant in disability claims" while discounting that of a treating physician).   But Courts are "appropriately skeptical" when, as here, "the greatest degree of persuasion was assigned to a non-examining state agency consultant's opinion, and the least was afforded to plaintiff's own treatment providers."  *White v. Commissioner of Social Security*, No. 20-CV-6222, 2022 WL 951049, at *5 (S.D.N.Y. March 30, 2022) (quoting *Amber H.*, 2021 WL 2076219, at *8); *see also Estrella*, 925 F.3d at98 (noting that the Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination") (quoting *Selian*, 708 F.3d at 419).   That skepticism is

"compounded by the ALJ's limited evaluation of the supportability and consistency factors" as set forth above. *Amber H.*, 2021 WL 2076219, at *6.

### 3.   The ALJ's Evaluation Of Dr. Rose's "Opinion"

The ALJ's assessment of Dr. Rose's "opinion" was triply flawed.  The ALJ mischaracterized Dr. Rose's prescriptive treatment instructions as mere "opinion;" found inconsistency without basis to do so; and failed to develop the record by obtaining a medical source opinion from Dr. Rose.

#### a.  Mischaracterization And The Consistency Factor

The ALJ did not explain why she treated Dr. Rose's 12 office notes – spanning at least a year and three months, and each addressing different aspects and stages of Ayala's impairments during a particular visit – as a singular "opinion."  (R. 17; *see* 318-35, 378-408, 411-15, 519-68.)  "Treatment notes … are not ordinarily a substitute for a treating physician's opinion."  *Merriman*, 2015 WL 5472934, at *17; *see also Peed v. Sullivan*, 778 F.Supp. 1241, 1246 (E.D.N.Y.1991) ("To obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable than that of an examining physician … It is the ***opinion*** of the treating physician that is to be sought; it is his ***opinion*** as to the existence and severity of a disability that is to be given deference) (emphasis in original).

Furthermore, the ALJ did not explain why she would consider Dr. Rose's ***prescriptive treatment instructions*** to Ayala regarding what to avoid in his daily activities as a medical opinion to be discounted as unpersuasive.  (R. 17, 380, 384, 388, 393, 398, 401, 405, 408, 553, 557, 563, 567.)  The opinions that the ALJ credited – those

of consultants Dr. Healy and Dr. Chen – are, by the ALJ's own finding – inconsistent with Dr. Rose's repeated prescriptive treatment notes. Accordingly, the only way to harmonize Dr. Rose's treatment notes with Dr. Chen and Dr. Healy's "persuasive" opinions, would be to mischaracterize the treatment notes as a discounted opinion of Ayala's treating doctor. That is what the ALJ did, and, in doing so, erred. *See, e.g.*, *Ericksson*, 557 F.3d at 82-83 (remanding, in part, because the ALJ "unreasonably minimized Dr. Backe's diagnosis"); *Kohler*, 546 F.3d at 268-69 (2d Cir.2008) (remanding because the ALJ "mischaracterize[d] relevant evidence"); *Jackson*, 2022 WL 620046, at *19 (recognizing that courts routinely remand an ALJ's decision "when it ignores or mischaracterizes medical evidence or cherry-picks evidence that supports his RFC determination while ignoring other evidence to the contrary") (citing *Velasquez v. Kijakazi*, No. 19-CV-9303, 2021 WL 4392986, at *27 (S.D.N.Y. Sept. 24, 2021) (collecting cases)).

In essence, the ALJ concluded that Dr. Rose treated Ayala incorrectly – for more than a year – once again improperly adopting the mantle of medical expertise and substituting her own medical judgment for that of Ayala's treating doctor. As explained above, the ALJ's usurpation of medical determinations is grounds for remand. *See, e.g.*, *Riccobono*, 796 F. App'x at 50; *Bienvenido J.P.*, 2022 WL 901612 at *5 n. 3; *Vellone*, 2021 WL 319354, at *9; *Amarante*, 2017 WL 4326014, at *10.;

Moreover, the ALJ provided no explanation for why an assessment of "no overhead lifting, pushing or pulling" is inconsistent with evidence of "mildly decreased motor strength." (R. 17.) Is motor strength the only measure relevant to the ability to lift, push, or pull? Did the ALJ's reference to evidence of mildly decreased motor strength refer to medical record evidence regarding motor strength in particular parts of the body

or in all respects?  Again, the Court is left to ponder the logical gap in the ALJ's reasoning, demonstrating the inadequacy of the ALJ's explanation of the inconsistency factor.

### b.  The ALJ Did Not Sufficiently Develop The Record

The ALJ's assessment of Dr. Rose's treatment of Ayala is all the more problematic because the ALJ did not seek an actual medical source statement from Dr. Rose.  In failing to do so, the ALJ failed to sufficiently develop the record and committed error.

Under the new regulations, courts often find that an informed decision could not be reached where an ALJ failed to obtain opinion evidence from the plaintiff's long-term treating physicians, especially when the treating relationship continues after the state agency consultants have rendered their opinions.  *See, e.g.*, *Acosta Cuevas*, 2021 WL 363682, at *11 (concluding that, under the new regulations, the duty to develop the record "takes on heightened importance with respect to a claimant's treating medical sources, because those sources 'are likely to be the medical professional most able to provide ***a detailed, longitudinal picture*** of [a claimant's] medical impairments(s) and may bring a unique perspective to the medical evidence that cannot be obtained from … reports of individual examinations) (quoting *Marinez v. Commissioner of Social Security*, 269 F. Supp. 3d 207, 216 (S.D.N.Y. 2017)) (emphasis added); *Russ v. Commissioner of Social Security*, 2022 WL 278657, at *10-11 (S.D.N.Y. Jan. 31, 2022) (remanding for failure to develop the record where the ALJ failed to obtain any "functional assessment from [the plaintiff's] treating pain-management professionals that takes into account the medical records post-dating the opinion of" non-examining state agency reviewer); *Manzella*, 2021 WL 5910648, at *15 (remanding because "the ALJ failed to adequately develop the

record" where the "only medical source to provide an RFC assessment" was a stale opinion from a consultative examiner).

Dr. Rose continued to treat Ayala through at least May of 2019, well after the opinions by the agency consultants were rendered: Dr. Chen examined the then-available records in July 2018, and Dr. Healy conducted his one-time examination in June 2018. (R. 77-82, 432-35, 518-68.)   Dr. Rose has a far more complete, and more recent, understanding of Ayala's condition.   By mischaracterizing Dr. Rose's treatment instructions as a singular opinion, the ALJ improperly obscured her failure to obtain a true medical source statement from Dr. Rose.  Having failed to properly develop the record, remand is warranted.  *See Acosta Cuevas*, 2021 WL 363682, at *11; *see also Rosario v. Kijakazi*, No. 20-CV-5490, 2022 WL 875925, at *11 (S.D.N.Y. March 15, 2022), *R. & R. adopted*, 2022 WL 976879 (S.D.N.Y. March 31, 2022); *Russ*, 2022 WL 278657, at *10-11.

## CONCLUSION

For the reasons stated above, pursuant to sentence four of 42 U.S.C. § 405(g), Ayala's motion is GRANTED, the Commissioner's motion is DENIED, and this case shall be REMANDED for further proceedings consistent with this opinion.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: August 9, 2022
　　　New York, New York

Copies transmitted on this date to all counsel of record.

46